**SO ORDERED: November 23, 2005.**



_____
**James K. Coachys
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ROYAL HAVEN BUILDERS, INC. | ) | |
| | ) | CASE NO. 02-21301-JKC-11 |
| Debtor. | ) | |
| | ) | |
| ROBERT W. LEASURE, JR. CHAPTER 11 | ) | |
| TRUSTEE OF ROYAL HAVEN | ) | |
| BUILDERS, INC. and ERIC H. TAUER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | ADVERSARY PROCEEDING |
| v. | ) | NO. 04-00692 |
| | ) | |
| MONROE BANK, R & N PROPERTIES, | ) | |
| LLC, NINA HOWARD, RHI, LLC, KURT | ) | |
| TAUER, JASICK CASH FLOW SOLUTIONS, | ) | |
| NICK A. TILLEMA, MUD CREEK SEWER, | ) | |
| INC., JON HANDY, BROWNSBURG | ) | |
| LUMBER CO., INC., d/b/a LUMBER ONE, | ) | |
| GARY OGLE, GERALD GOWEN, | ) | |
| HURRICANE PROPERTIES, LLC, | ) | |
| STEPHEN OSMUN, STEPHEN KAISER, | ) | |
| B & R HEATING & AIR, INC., BRIAN K. | ) | |
| LECHLEITER AND DONALD STAFFORD, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING MONROE BANK'S MOTION TO DISMISS CROSS-CLAIMS

This matter came before the Court on Cross-Claim Defendant Monroe Bank's ("Monroe") Motion to Dismiss Cross-Claims (the "Motion"), wherein Monroe argued that Court should dismiss, for lack of subject-matter jurisdiction, the Cross-Claims (collectively, the "Cross-Claims") asserted by Jasick Cash Flow Solutions, Inc., Nick A. Tillema, Mud Creek Sewer, Inc., Jon Handy, Brownsburg Lumber Company, Inc. d/b/a/ Lumber One, Gary Ogle, B&R Heating & Air, Brian K. Lechleiter, Steven Osmun, Nina Howard, R&N Properties, LLC., Gerald Gowen, and Hurricane Properties, LLC (collectively, the "Cross-Claimants").[1]  For the reasons stated below, the Court agrees and, therefore, grants Monroe's Motion.

On December 1, 2004, Robert W. Leasure, Jr., as Chapter 11 Trustee of Royal Haven, Inc. and Eric H. Tauer (the "Trustee"), filed his Complaint to Set Aside Fraudulent Transfers and Preferences (the "Complaint") seeking unspecified damages from various defendants, including Monroe and the Cross-Claimants, on fraudulent transfer and preference theories.  The Complaint contains thirty-three counts, twenty-nine of which name Monroe as a defendant.  Those twenty-nine counts concern fourteen separate loan transactions between Monroe and various investors, including the Cross-Claimants (collectively, the "Investors"), by which Monroe loaned over $2,700,000 and received, as collateral, mortgages attaching to approximately fifty parcels of real estate.

The Complaint alleges that during the summer of 2001, the Debtors lacked sufficient cash to operate their respective businesses and, desperate for cash, approached Monroe for loans. Monroe advised Debtors, however, that it could not extend any additional credit because it had

---

[1] In all, four separate Cross-Claims were filed against Monroe.  The Cross-Claim filed by Gerald Gowen and Hurricane Properties, LLC has already been dismissed by stipulation.

reached its lending limit (Compl. ¶¶ 12, 13). An alternative financing technique was then devised to evade Monroe's lending limit and to accomplish indirectly what could not be accomplished directly (Compl. ¶ 13). The alternative financing technique involved conveying real property owned by the Debtors to one of the Investors, who would then apply to Monroe for a loan secured by a mortgage on that real property (Compl. ¶ 14) (the "Real Property Transfers").

The loan proceeds were used to satisfy any existing liens on the real property disclosed by title work obtained by Monroe in connection with the loan, and any remaining proceeds were paid to the Investors (Compl. ¶ 14 (which is incorporated into each and every Fraudulent Transfer Count)) (Each such loan is hereafter referred to as an "Investor Transaction."). Each of the Fraudulent Transfer Counts involves an Investor Transaction (Compl. ¶¶ 29, 42, 63, 75, 96, 108, 129, 141, 171, 184, 248, 263, 274, 289, 300, 314, 325, 338, 359, 369, 383, and 395). Through the Investor Transactions, Monroe issued loans worth not less than $2,706,465 and perhaps as much as $5,324,715.

Subsequent to closing each Investor Transaction, the Debtors would alternatively deposit funds into a bank account established at Monroe in the name of the Investor, who would then use the funds in that account to make payments on the loan, or the Debtors or a related entity would make payments, either by check or wire transfer, to Monroe to be applied to the loan (Compl. ¶¶ 21, 22). Such payments were often made by the Debtors' alter egos, White Lick Sewer, Inc. and E.T. Investments, LLC, which were used as conduits to deposit funds belonging to Royal Haven and to write checks in satisfaction of Royal Haven obligations (Compl. ¶¶ 25-28). In this manner, the Debtors transferred, either to or for the benefit of Monroe, cash or cash equivalents in the amount of $243,407.56. These amounts were applied to the loans made by Monroe to the Investors.

3

(Compl. ¶¶ 31, 65, 98, 131, 173, 250, 276, 302, 326, 341, 361, and 385). Subsequent to the Investor Transactions, the Debtors transferred cash or cash equivalents in the amount of $75,682.95 to a handful of unidentified third-party vendors for "improvements" made to several of the properties that had been transferred to the Investors (Compl. ¶¶ 31, 173, 250, 276).

In each Investor Transaction, the Debtors paid the Investor for its assistance in obtaining the loans from Monroe:

> The Debtors promised the "investor" a modest fee . . . as an inducement to participate in this arrangement. In other of the Investor Transactions, Royal Haven promised to use a portion of the loan proceeds endorsed over to it to make a partial payment on existing indebtedness that Royal Haven owed to the "investor" or to a business entity owned by the "investor" that Royal Haven was otherwise unable to satisfy.

(Compl. ¶ 15 (which is incorporated into each and every Fraudulent Transfer Count)).

In response to the Fraudulent Transfer Counts, the Cross-Claimants asserted the Cross-Claims against Monroe, alleging that the Debtors arranged for the Investors Transactions through Monroe's Senior Vice-President Bryan F. Kain ("Kain") to the detriment of the Cross-Claimants. The Cross-Claimants seek indemnification from Monroe in the event that liability is imposed against them under the Trustee's Fraudulent Transfer Counts. Monroe contends, however, that the Court lacks subject-matter jurisdiction over the Cross-Claims and that they should be dismissed pursuant to Fed.R.Civ.P. 12(b)(1) (incorporated into bankruptcy pursuant to Fed.R.Bankr.P. 7012). The Cross-Claimants counter that there is a sufficient nexus between their claims and the bankruptcy estate to support the Court's jurisdiction.[2]

---

[2] Cross-Claimants Jasick Cash Flow Solutions, Inc., Nick A. Tillema, Mud Creek Sewer Inc., Jon Handy, Brownsburg Lumber Co., Gary Ogle, B&R Heating & Air, Inc., and Brian Lechleiter jointly filed a response to Monroe's Motion, to which Cross-Claimants Nina Howard and R&N Properties joined. Cross-Claimant Stephen Osmun did not file a response to the Motion.

Like all other federal courts, the bankruptcy court is a court of limited jurisdiction and receives its jurisdictional mandate through a statutory grant of power. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08, 115 S.Ct. 1493, 1498-99 (1995). Jurisdiction is initially conferred on the district courts pursuant to 28 U.S.C. § 1334(b), which extends jurisdiction to them over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." The district courts may, in turn, refer "any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . to the bankruptcy judges for the district." 28 U.S.C. § 157(a). Bankruptcy jurisdiction, therefore, encompasses and is limited to proceedings "arising in," "arising under" or "related to" a case under Title 11.

Here, the parties agree that the Court's subject-matter jurisdiction–if it exists at all–is based on "related to" jurisdiction. As explained by the Supreme Court:

> Congress did not delineate the scope of "related to" jurisdiction, but its choice of words suggests a grant of some breadth. The jurisdictional grant in §1334(b) was a distinct departure from the jurisdiction conferred under previous Acts, which had been limited to either possession of property by the debtor or consent as a basis for jurisdiction. *See* S.Rep. No. 95-989, 2nd Sess., pp. 153, 154 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5939, 5940. We agree with the views expressed by the Court of Appeals for the Third Circuit in *Pacor, Inc. v. Higgins,* 743 F.2d 984 (1984), that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate," *id.,* at 994; *see also* H.R.Rep. No. 95-595, pp. 43-48 (1977), and that the "related to" language of § 1334(b) must be read to give district courts (and bankruptcy courts under § 157(a)) jurisdiction over more than simple proceedings involving the property of the debtor or the estate. We also agree with that court's observation that a bankruptcy court's "related to" jurisdiction cannot be limitless. *See Pacor, supra,* at 994; *cf. Board of Governors, FRS v. MCorp Financial, Inc.,* 502 U.S. 32, 40, 112 S.Ct. 459, 464, 116 L.Ed.2d 358 (1991) (stating that Congress has vested "limited authority" in bankruptcy courts).

*Celotex*, 514 U.S. 307-08, 115 S.Ct. at 1498-99. Proceedings "related to" the bankruptcy include (1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. §

541, and (2) suits between third parties which have an effect on the bankruptcy estate. *See* 1 Collier on Bankruptcy ¶ 3.01[1][c][iv], p. 3-28 (15th ed. 1994). The first type of "related to" proceeding involves a claim like the state-law breach of contract action at issue in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The instant case involves the second type of "related to" proceeding.

In *Pacor, Inc. v. Higgins,* 743 F.2d 984 (1984), the Third Circuit devised the following test for determining the existence of "related to" jurisdiction:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy* . . . . Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."

*Id.,* at 994 (emphasis in original; citations omitted). The First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have adopted the *Pacor* test with little or no variation. *See Celotex,* 514 U.S. at 307-08, 115 S.Ct. at 1498-99 (collecting cases). As noted by the Supreme Court, however, the Second and Seventh Circuits have adopted a slightly different standard. *Celotex*, 514 U.S. at 309, 115 S.Ct. at 149 (citing *In re Turner*, 724 F.2d 338, 341 (2nd Cir. 1983); *In re Xonics, Inc.,* 813 F.2d 127, 131 (7th Cir.1987); *Home Ins. Co. v. Cooper & Cooper, Ltd.,* 889 F.2d 746, 749 (7th Cir. 1989)) stated as:. The court in *Xonics* stated:

> There is jurisdiction under § 157(c)(1) only when the dispute is "related to" the bankruptcy–meaning that it affects the amount of property available for distribution or the allocation of property among creditors. The bankruptcy jurisdiction is designed to provide a single forum for dealing with all claims to the bankrupt's assets. It extends no farther than its purpose. That two creditors have an internecine conflict is of no moment, once all disputes about their stakes in the bankrupt's property have been resolved.

*Xonics*, 813 F.2d at 131 (citing *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396 (1978) (same principle outside bankruptcy law–a cross-claim between defendants requires a new source of federal jurisdiction when it does not affect the disposition of the claim that supplied original federal jurisdiction)).[3]

Applying the Seventh Circuit's standard here, the Court concludes that it lacks subject-matter jurisdiction over the Cross-Claims. The Cross-Claimants merely seek indemnification from Monroe in the event liability is imposed against them under the Fraudulent Conveyance Counts. As such, the Cross-Claims are ultimately a dispute limited to non-debtor parties, the outcome of which will have no effect on the amount of property available for distribution or the allocation of property among creditors. In support of its argument, the Cross-Claimants contend that if the Cross-Claims are "dismissed and refiled in state court, all parties would be at risk of inconsistent decisions and issue preclusion by any determination of material fact between the parties in either the state court or this adversary." True as this might be, such risks are not relevant in determining subject-matter jurisdiction under the Seventh Circuit's standard.

For the above reasons, the Court grants Monroe's Motion to Dismiss and dismisses each of the remaining Cross-Claims.

###

---

[3] Because the Seventh Circuit has adopted a distinct standard, the Court rejects cases cited by the Cross-Claimants, especially those cases which held that "contribution" is a sufficient basis for "related" to jurisdiction, from other courts.

Distribution:

Christopher E. Baker
Katherine A. Starks
William R. Richards
Richard D. Gilroy
George W. Hopper
John R. Carr III
Richard C. Richmond III